## FRANCES P. REED *vs.* S. AMOS REED ET AL.

*Bill to Vacate Voluntary Deed to Confidential Agent—Burden of Proof.*

Upon a bill by a mother to vacate, because obtained by undue influence, a voluntary deed executed by her to her son, who was also her confidential agent, the burden of proof is upon the grantee to establish that the deed was the free, voluntary and unbiased act of the grantor.

Plaintiff's bill in this case alleged that she had been induced to execute a deed conveying certain property to her son in consequence of undue influence exerted upon her by him at a time when she was excited and put in fear by a threatening anonymous letter. The bill prayed that the deed be declared void and set aside. · *Held*, upon the evidence, that the deed was the voluntary act of the grantor and had not been extorted from her by fraud, or undue influence or the abuse of confidential relations.

Appeal from the Circuit Court for Kent County, where the following opinion was delivered by MARTIN, J., and concurred in by PEARCE, C. J., and BROWN, J.

This suit was instituted for the purpose of having set aside a deed from the plaintiff to the defendant executed on the tenth day of October, A. D., nineteen hundred and two, on

the ground that the same was obtained by undue influence and fraud.  In cases of this character proceedings are not often taken during the lifetime of the grantor, but generally after his death by those claiming to be in interest.

Here the grantor is still living, and we have the benfit of her evidence as well as that of all of the parties who had anything to do with the transaction.  It is well that it is so, for *she* should be able to state the whole influence upon her, and not leave anything to the imagination, as is not infrequently the case where the grantor is dead.  The grantor in the deed undertakes, after reserving to herself a life estate, to give the farm therein described to the grantee for his life, with remainder to his children, he and they being respectively her son and grandchildren.

It was conceded in the argument that, in addition to being her son, the grantee, S. Amos Reed, was such an agent of the grantor, Frances P. Reed, as would establish the condition of confidential relations between them.  The concession eliminates from our consideration much of the evidence taken in this case.  This one presents some peculiarities different from the usual facts ordinarily alleged and proved in cases of this character.  We will endeavor not to extend this opinion by any unnecessary consideration of the evidence or of the differences between the members of this inharmonious family especially those which have arisen since the date of the deed and which could have no possible effect upon its execution or the causes which led up to it, but which may be the very natural feelings of disappointment that follow it.

George R. Reed, of Kent County, died in August, A. D. 1897, leaving a large real estate, consisting of several farms estimated to be worth about twenty-seven thousand dollars and leaving surviving him a widow and seven children.  His widow, who is the plaintiff in this case, was his sole legatee and devisee, and thereby became possessed of five farms. Shortly after the death of Mr. Reed all of the children, who had not already done so, left home.  The daughters married and the sons sought and secured employment elsewhere, some

out of the State, and all some distance from their mother.
Amos was the eldest child, and was then renting the farm
known as the Wroth farm, a few miles distant from the home
farm, on which Mrs. Reed lived.   When the others all left,
Amos, at the solicitation of his mother, moved to the home
place, occupying a small house thereon, a short distance from
his mother's residence, in order, as she says, to be near her,
and undertook to attend to her business for her, which, she
also says, he did "pretty well" until October tenth, nineteen
hundred and two, when this deed was executed.   On the 9th
of October of that year Mrs. Reed received an anonymous
letter, advising her that her daughter, Mrs. Jones, had lost her
divorce suit, and suggested that she might be sued for slander
of her son-in-law, against whom she had talked and testified,
and advising her to convey away her property to her children
at once.   With this she repaired to her son, Amos, who read
it, and said he knew nothing of it and did not know how to
advise her, but would take her to town next morning to con-
sult her lawyer, Mr. Beck; and accordingly they sought him
for advice.   He read the letter, gave his opinion of it, and also
told her that in his opinion the son-in-law would never under-
take to sue her, and, if he did, a conveyance for the purpose
of defeating such a suit would amount to nothing, and he de-
clined to draw the deed which she requested, because it would
strip her of all her property, and advised her that a will would
accomplish her purpose, if she desired to dispose of her prop-
erty after her death amongst her children.   Mr. Beck was her
adviser, whom she not only consulted then, but had been con-
sulting ever since the death of her husband.   Thus far, all
practically agree, but now comes the parting of the ways.   The
plaintiff alleges in her complaint and testifies that after she
had shown the letter to Mr. Beck and had been told about the
will, she and her son Amos repaired to the private office of
Mr. Beck and had a conversation, and, after returning, Mr.
Beck, without explanation, suggestion or authority, began to
prepare the deed now in controversy, and that she signed it
without knowing or understanding its contents, and that she

was so excited and nervous from the effects of that letter she would have signed anything they presented to her; and further stated that on her way home that night she was dissatisfied with what she had done and asked Amos to explain it to her, which he declined to do, because it was so dark he was afraid his horse would fall.

Mr. Reed, on the other hand, alleges and testifies that his mother time and again, prior to this meeting, told him this farm was to be his, both because he had stuck by her and because his father had expressed the desire that he should have it; that he made no suggestion about the matter, but that she herself had done so on that occasion; that she furnished the data for its preparation, including the names of his children, and that it was her free and unbiased act, executed without solicitation or suggestion from him or on his behalf.

The law governing cases of this character has been laid down by our Appellate Court in a great number of instances, and it has been consistently maintained from the case of *Brooke* v. *Berry*, 2 Gill, 83, to *Brown* v. *Mercantile Trust Company*, 87 Md. 377, that "a gift obtained by any person standing in a confidential relation to the donor is *prima facie* void, and the burden is thrown to the donee, to establish to the satisfaction of the Court that it was the free, voluntary and unbiased act of the donor." This means, however, that if it was the free and voluntary act of the donor a gift deed is as good as any other and must be measured by the same standard. It won't do to make such a conveyance, and because the grantor should subsequently regret it, to come in and ask the Court to undo the act so deliberately done. Let the grantee once discharge the burden imposed upon him and overcome the *prima facie* case, the Court would never strike down the deed either to gratify the caprice of the grantor or because subsequently thereto the relations of the parties changed. But, even to this general rule of law applicable to confidential relations, there is a limitation, which limitation was first distinctly enunciated in the case of *Grove* v. *Todd*, 33 Md. 192. Conceding the existence of confidential relations

between the parties to a deed, the reason of the rule, making it *prima facie* void is, that for the common security of all mankind, gifts procured by agents and purchases made by them from their principals, should be scrutinized with a close and vigilant suspicion, and thus prevent the abuse of confidence and the acquisition of unreasonable gifts and advantages. In such cases entire good faith and the full disclosure of all the facts and circumstances are required, as well as an absence of undue influence, advantage or imposition. All of this assumes that the deed is the result of undue influence upon, or dominion over, the grantor by the grantee, which is usually accomplished by secret and stealthy means, but a different rule obtains if it can be shown that the person by whom the benefits have been conferred had competent and independent advice in conferring them. This simply means that the party attempted to be affected and deceived has shaken off the shackles of dominion; and such competent and independent advice rebuts the presumption arising from the mere fact of confidential relations.

Plaintiff's counsel, in argument, laid great stress upon the point that but for the receipt of the anonymous letter this deed would not have been executed; that, as the letter was a fraud, the defendant would not be permitted to enjoy the fruits of it, though he had nothing to do with it. It does not appear in the evidence that Amos Reed had anything to do with sending this letter, or even had any knowledge of it. Nor does it appear to us that the letter is the cause of the execution of the deed. The deed was the sequence of the letter but not necessarily caused by it. The visit to Mr. Beck was certainly the result of the receipt of the letter, and it is reasonably certain that Mrs. Reed went to Chestertown for the purpose of conveying away all of her property, as she apprehended her son-in-law was after it. But it is also apparent that after she consulted her attorney she did not do what she intended to do. Her fears must needs have been quieted by him, for she continued to hold all four of the other farms and retained a life estate in the one in controversy. We must

conclude from that that the deadly influence of the *upas* letter had passed from her, and then we look for some other motive for her act.   Do we find it ?   If the testimony of Amos Reed is to be believed, we do, for he says his mother directed Mr Beck to draw this deed and gave as her reason therefor that his father wanted him to have this farm, and, come what may, she wanted it conveyed to him.   This does not seem to have been an inspiration of the moment, but an intention which had existed for some time in her mind.   It was shown by all of the witnesees on that point that the Wroth farm was the most valuable one left by George R. Reed, and that it was in the tenancy of Amos Reed at the time of his father's death. Shortly thereafter, Amos declares that his mother urged upon him to leave the more desirable farm to go near and look after her, and told him even that long ago that he would never have to move again, as this was to be his farm.   We are not unmindful of the fact that Mrs. Reed contradicts this, as she does every other witness on this point, yet the witnesses Younger, Frank L. Reed, S. Amos Reed, Jr., and Cummings all positively say that Mrs. Reed frequently told Amos that the farm was to be his, and that it was his father's wish that he should have it.   In addition to that, Mr. Crawford's evidence tends to confirm them, for he said that Mrs. Reed told him that Amos was the only one of the children who stuck by her, and she would stick by him.   Without meaning the slightest reflection upon Mrs. Reed, who said several times her memory had become very bad, the great preponderance of evidence shows that, time and again, she expressed her intention to give the farm in controversy to Amos.   This condition of things existed from the death of George R. Reed up to the time of the execution of the deed, and she must have executed it in conformity with this intention.   In addition to that, the evidence certainly shows that Amos was the only child who did stay by and look after her, and she expressed her gratitude for it to Mr. Crawford and declared her intention of doing for him, because he had done for her.

It may not be necessary to revert to the question of Mrs.

Reed's mental capacity, in view of the fact that confidential relations existed.    Indeed, up to the time of the execution of this deed no question was raised about her capacity.    A number of witnesses who had business relations with her described her as a woman of robust health and great strength of mind and will.    She needed no physician's care until March, nineteen hundred and three, when she appears to have suffered from an illness the nature of which was not disclosed, but which might account for her now failing memory.    We can recall no evidence even from her own witnesses which even intimated any lack of capacity.

Was the plaintiff imposed upon in the execution of this deed? If so, by whom?  We fail to find in all of the evidence of Mrs. Reed any request or suggestion during all of the five years of close relationship from Amos Reed for this farm.    Mrs. Reed does not pretend to say that he ever even indicated a desire to have it.    Yet in her bill of complaint she says she was imposed upon.    She declares that when she went to Mr. Beck's office for advice that he and Amos went into the private office, and intimates rather than charges that they concocted the transaction of the deed.  In that she is flatly contradicted by Mr. Beck, Mr. Reed and Mr. Loud, all of whom testify that Mr. Reed did not leave the front room, but conversed with a clerk during the time Mrs. Reed was consulting her attorney; that Mrs. Reed herself went into the private room and consulted Mr. Beck, who was her counsel and to whom she had confessedly come for advice; that the deed was prepared and read to her, and that she corrected it in one particular in which it was wrong, and that she executed it with the full knowledge of its contents.    She says she was dissatisfied with it that very evening, and asked her son that night on the way home to explain it.    If that be true, does it not seem strange that when she came back the very next day to complete the work begun the day before she does not ask Mr. Beck to explain it to her. He drew it; he was the man from whom she sought counsel, and yet she never intimated to him any dissatisfaction with her act.  Of him she makes no inquiry; to him she makes no

complaint and no objection. Indeed, she never appears to have reverted to it again until she went to Baltimore the following March and fell in with her other children.

Then, as the deed itself appears to be in consonance with her frequently expressed views of what she intended to do, as well as to carry out the wishes of her husband. As it contains no unusual provisions which furnish any intrinsic evidence of unfairness or fraud. As it was a suggestion of her own, for so we must determine it, and for the purpose of requiting the grantee for services and kindness. As it was prepared according to her instructions, by her own attorney, who is certainly competent and honest, and to whom she repaired for independent advice. As it was read over to and approved by her, and then deliberately executed and delivered, we are forced to the conclusion that it was her free, voluntary and unbiased act, and she must abide by it. We can not strike down a deed thus deliberately made, even though for reasons unknown to us she has since repented of it. We will, therefore, pass an order dismissing this bill of complaint, with costs to the defendant.

The cause was argued before McSherry, C. J., Fowler, Briscoe, Page, Boyd, Schmucker and Jones, JJ.

*S. S. Field* (with whom was *Marion deK. Smith* on the brief ), for the appellant.

*Richard D. Hynson* and *William W. Beck,* for the appellees.

Fowler, J., delivered the opinion of the Court.

The case which is presented by this appeal belongs to a class than which there is none more important. It is an attempt to set aside a deed which the grantor alleges was the result entirely of the confidential or fiduciary relation the grantee, her son, occupied towards her, and of his influence over her, and she charges that he took advantage of the condition of excitement, distress and fear into which she was thrown by an anonymous letter, to procure the execution of

the deed by her to him and that he procured said deed by the exercise of undue influence upon her at a time when she was too weak from age, infirmity, fear and excitement to withstand said influence or appreciate what she was doing.

The principles which must govern in such cases as this have been so often and so clearly announced by this Court that the law upon the subject may be considered settled in this State. Indeed we do not understand that there is any difference between counsel as to the law of the case; but there is a very wide difference between them as to the facts or more properly speaking, as to the conclusions to be drawn therefrom.

The Court below dismissed the bill and this is the plaintiff's appeal.

The answer of the defendants admits, and the case comes before us on the concession on all hands, that a confidential relation existed between the grantor and grantee. The latter was the eldest son of the former and therefore her voluntary deed to him was *prima facie* void, and the burden is on him to establish that it was the free, voluntary, unbiased act of the grantor. *Whitridge* v. *Whitridge*, 76 Md. 73. The fact on which the whole case turns is the anonymous letter, and the effect it had upon the plaintiff, in causing her as she alleges, to make the deed in question. The letter is as follows:

Chestertown, Md.

Mrs. Reed:

As a friend I would like to tell you of some of the things I have heard, one is that Fanny has lost her case and that Al Jones intends to sue you for slander. Now my advice to you is make over your property to your children or in trust to your grandchildren if he does not win his suit you can get it back and if he does win it you will lose every thing you have; this must be done quickly or it will be too late, as Court commences in a few days. A Friend."

It appears that when the plaintiff received this letter she at once showed it to her son, the defendant, and he advised her immediately to see her counsel a most respectable member of the Kent County Bar. It may be conceded that if the deed was in fact the fruit of this letter, the Court should not hesitate to

declare the deed void and set it aside.   But although the counsel for the appellant made a most ingenious and forcible argument upon this point we do not think the conclusion he reached is supported by the weight of the testimony.   It is true she says that she was greatly frightened by the threats of suit contained in the letter, and that she consulted Mr. Beck, her counsel, for the purpose of conveying all of her property to her children and grandchildren.   He refused to sanction this course, he says, for two reasons, first, it would strip her of her entire estate, and, second, that if her son-in-law, A. O. Jones, obtained judgment against her in the threatened slander suit he could have the deed set aside for fraud. But it must be remembered that Mr. Beck testified clearly and distinctly that after he had refused to prepare deeds to make all her property over for the reasons above suggested, she then said that she wanted her son Amos to have a deed for the home farm (the one conveyed by the deed in question) so he would be protected whether this suit was brought or not;   and that her husband and she also had always intended this farm for Amos (the defendant);   that he had been a good and dutiful son and the only of her children (boys) who had stood by her.   But this is not all.   The deed was dated the 10th October, 1902—and on the following day in spite of the fact that the plaintiff declares she had hardly signed the deed before she began to realize that she had done wrong and so stated to her son on the evening of the day the deed was executed, yet the very next day she returned to her counsel who prepared the deed to have her will drawn.   She not only makes no complaint to him about the deed, but she in a manner reaffirms it by devising all the rest of her property to her remaining children, omitting to mention in her will her eldest and at that time, apparently, her favorite son except to bequeath him a wardrobe.   This conduct can scarcely be reconciled with any other hypothesis than that when she made the will she was fully satisfied with the deed and intended Amos to take all it conveyed.

However without extending this opinion we desire to say

that we have carefully considered the testimony contained in the record, and have come to the same conclusion upon the facts that was reached by the Court below.    And for the reasons we have given, and for the reasons given in the clear and forcible opinion delivered in this case by the learned Judges of the Circuit Court for Kent County which we request the reporter to include in the report of this case we will affirm the decree appealed from.

*Decree affirmed with costs.*

(Decided March 23rd, 1905.)